case number 237091. Good morning. Good morning, your honors. May it please the court, my name is Brendan White. I represent Mr. Ganiyu in his appeal of the denial of bail in the district court. Your honors, this is not a presumption case. It's an alleged financial crimes case in which bail is routinely granted. What's the standard of review, our standard of review? We're dealing with something that a district court has asked to have an experience. Of course, your honor. Who also somehow seems to get half the headline case filed in the southern district. But to what extent, what difference do we owe to the district court? Well, as your honor alludes to, there's a high degree of deference, of course, to the judge's holding. But here, nevertheless, your honors, I think the facts show pretty clearly an abuse of discretion here. We have a case, and just to clear up a potential misimpression, in the government's opposing papers, they suggested that Mr. Ganiyu does not dispute the overwhelming nature of the proof in this case. And in fact, of course, Mr. Ganiyu does dispute that. And a trial date has been set for April. He fully intends to go to trial. What's the date? April 16th. Okay, I'll look it up. Thank you, your honor. He fully intends to go to trial. His priority, as it certainly should be, is defending against these admittedly serious, but we maintain ultimately non-meritorious charges. Can you get to why it was an abuse of discretion, particularly given the record in this case, in terms of the degree of contact your client has overseas, how long he's spent overseas? Apparently he has two children in the U.S., but he doesn't have contact with them. His own uncle wouldn't sign his bond, be assured his bond. So how, given his ties, given his access to means, given the fact that he doesn't have real family ties in the United States, how is this an abuse of discretion? Certainly, your honor. Well, first, yes, of course, Mr. Ganiyu is an immigrant. We're a nation of immigrants, and he is in the import-export business upon which our nation and our city was founded. Well, the immigration status will not be held against him. Of course, we know many folks are immigrants. Certainly. I would never suggest such a thing, of course, your honor. But just –  Certainly. And the extent to which he spends time outside of the United States. He is in the import-export business, which necessarily requires him to travel between the two countries, between the United States and Canada. Of course. But there's travel, and then there's spending eight, nine months living in another country. He does have family there. Again, not to belabor the point, but yes, he is an immigrant and has family that remains in his home nation. He has, however – I apologize, your honor. What is it that Judge Gallagher wants? Most principally, a not-insubstantial bail package was proposed here, $250,000 PRB, with the signatures of six responsible people. I do want to point out, to your honors, that Mr. Gennady's family friend and his fiancée are present in the courtroom today. He has lived in this country for 15 years. And yes, clearly he has traveled back and forth between the United States and his home country. But again, that's part and parcel both of his career and the fact that he has family there. These people, many of whom – So a not-insubstantial bail package of $250,000, I think, was there a cash component to that? If I'm not mistaken, off the top of my head, I believe it was $30,000 cash. And the judge did not find that sufficient. That is correct, your honor. That your client would not flee back to Ghana. But among the judge's conclusions were that – well, and your honor, I am forced to submit to you that this was based on nothing but conjecture. That the people who have known him for a significant amount of time might not have enough moral suasion to continue him to stay here in the United States. Those people should have been questioned as to it. Let them understand what are the responsibilities you're undertaking to – I'm talking about my literal ignorance on this. You say $30,000 was the cash amount? Yes. Where does that come from and what is the rest? Your honor, I do have to apologize on this point that I am not the attorney in the district court here. I do not know exactly. But Mr. Ghani does own a legitimate import-export business. He has been in this country as a working resident. I understand that. I just am wondering because I was never in the district court on any of these cases or as a judge. And I'm just wondering what it means to say $30,000 is the cash and somehow or other the rest of the $250,000 must be something else. And I can't – I can't answer that. My personal experience is it's usually on a PRB, personal recognizance bond, it is usually supported by the signatures and the word of the people who are signing it. But if he doesn't show up, if he goes to Captain Ghani and doesn't come back, they don't have to – they gave their word, but they don't have to pay any money. These other people do not. Well, you know, I'm going to spin that in my favor and point out that it's because people actually fleeing on these things is, you know, vanishingly rare. It doesn't happen. The question, I think, is what happens when – if a person in your client's shoes flees, what happens to the people who post it? I can only speak honestly from my own experience, Your Honor, that it's never happened. So I can't say for certain. Well, I think it's happened with me, so I think I can answer your question, which is that they are on the hook for whatever they put up, whatever they signed. And so if someone signed as a cosigner for $50,000, then the government can go after them. They would be on the hook for that, yes, Your Honor, of course. Thank you for clearing that up. I have some questions about that, too, but I'll answer them. Thank you. It did not happen to me as a defendant or a cosigner. Ultimately, these are people who have worked in this country for extended periods of time, have jobs, careers. I have no question about that. My only question is how does it work? What happens to them if they're wrong, no matter how hard they believe it, no matter how much they're behind them? What happens if they're wrong? They're undertaking a very serious responsibility. And yes, as Judge Loyer pointed out, they are exposing themselves to very serious consequences. And they continue, as I pointed out, there are people here who continue to stand behind Mr. Ganiu, and they would continue to. Mr. Counsel, do you think it was appropriate for the court to consider the fact that his uncle, who was his closest family relative other than his children that he didn't have contact with, apparently, was unwilling through pretrial services to co-sign the bond? Is that something the court can also consider? Of course, as one factor. But as we have pointed out, it's not entirely clear how well the uncle actually knew Mr. Ganiu. And people have different thresholds of risk. I understand that, of course. If you reserve some time for rebuttal, we'll hear from the governor. Thank you, Your Honor. Go ahead. I apologize for this. Good morning. May it please the court, my name is Matthew Weinberg, and I represent the government in this appeal. Judge Kaplan did not err, much less clearly err in denying bail in this case. Judge Kaplan carefully reviewed the record before him. You're saying clear error as opposed to abuse of discretion. Yes, Your Honor. The standard here is to review it for clear error. Of course, the setting of bail is committed to the sound discretion of the district court. And this court should only overturn the bail determination if, on the entire evidence, this court is left with the definite and firm conviction that a mistake has been committed. It's the government's position, of course, that in this case that did not occur. Judge Kaplan. I'm sorry, but I always hear these tests, and when I hear definite and firm, I'm sorry, this is a very serious case, I don't mean to suggest it isn't, but I often sit here wondering what if they're left with a definite conviction, but it's not a firm conviction. Fair question, Your Honor. I'm sorry. Judge Kaplan reviewed and considered the record before him, including the arguments made to Magistrate Judge Figueredo at the bail hearing, and concluded that Mr. Gnaiu's significant ties to Ghana and his strong incentive to flee to that country meant that no set of conditions would reasonably assure his appearance as required. With respect to Mr. Gnaiu's significant ties to Ghana, Judge Kaplan primarily considered the undisputed facts that Mr. Gnaiu is a citizen of Ghana and not the United States, that Mr. Gnaiu has close family who lives in Ghana, and that Mr. Gnaiu has recently, in the past few years, traveled to Ghana for extended periods of time. And Judge Kaplan also noted Mr. Gnaiu's incentive to flee, and particularly that Mr. Gnaiu would be facing a potentially lengthy prison sentence if convicted at trial, to be followed by removal to Ghana in any event, thus giving him an incentive to flee before trial. Unless the Court has any other further questions, I'm happy to rest on my submissions. Thank you. Thank you, Your Honors. I was reminded, one of the things that Mr. Gnaiu proposed, and again, it's something that is routinely used by court, was home detention with electronic monitoring. Again, this is a case in which it seems very likely actually will go to trial. His principal goal is- What was Judge Kaplan's reason or the reason given for determining that that was insufficient, that is, home detention with electronic monitoring? I've got some experience with that, too. Understood, Your Honor. That was actually addressed slightly more by Judge Figueredo and less so by Judge Kaplan, but- Everybody knows that people can escape. True. Everybody knows you can get eaten by a shark if you go in the ocean. But millions of people swim in the ocean every day. The potential- You can choose not to swim in the ocean, but if you have a motive to leave the country because you may be facing jail, that's, I mean, not really a good analogy, right? People can avoid the ocean if they have fear of sharks. Sure. And, of course, somebody can avoid leaving their home if they have a strong motive to stay and defend. And just one last final point. Mr. Gnaiu has a lot of faith in our justice system. He is somebody who has actually been to trial and has been acquitted. He has less of a reason to be cynical about the justice system than many others, and he's asking for his right to- Let me ask the government. Is the government's position at home- Forgive me. I'm sorry. Is it the government's position that home detention with electronic monitoring just doesn't work? What's the government's position with respect to that on white-collar matters? Come on up. So I don't believe it's the government's position that there are no cases or no circumstances in which home detention or electronic monitoring would be appropriate and would reasonably assure defendants' return to court. Of course, the question before this court is whether it is sufficient in this case. And for all the reasons in the government's submissions and for the reasons identified by Judge Kaplan and by Judge Figueredo before him, it's certainly our view that it is not sufficient in this case. Why don't you just add a paragraph? What are those reasons? You're pointing to them, but you're not telling me what they are. The other reasons- Why it's not sufficient in this case. Sure. Well, again, the factors to be considered for whether detention is appropriate include, of course, the Mr. Guinea's connections to Ghana, which we've discussed, including very significantly his recent and extended visits to the country. Also appropriate to consider and important in this case is the significant and weighty evidence against- Why wouldn't electronic monitoring suffice to make sure that he's tracked, we know where he's going? It used to be maybe 12 years ago. I just don't know what the state of the technology is today, but the electronic monitoring was only as good as it gave someone a whatever, a four-hour head start. And if that's still the case, maybe that's the reason. That is still the case, yes. Electronic monitoring obviously can be helpful and an important tool in many cases, but this court has repeatedly affirmed denials of bail where electronic monitoring was proposed for precisely those reasons. The electronic monitoring devices can be removed and the defendant can have a head start towards heading to the airport. I'll point you to the Brennerman case, which is cited in the government's brief. That's a case where the defendant had proposed electronic monitoring, and this court had concluded that that would not be sufficient to reasonably assure the defendant's presence at trial. I'm sorry to belabor this point, but under what circumstances would it be? Would it be appropriate? Yeah. Well, again, without addressing too many hypothetical other cases, certainly not in a case as here. Well, I understand that's your argument, but under what circumstances would it be? Where perhaps a defendant has more clearly, well, I don't want to say has more clearly established connections to the United States, but has less of an alternative place to go, right? That is a significant issue here, is that the defendant has a very viable alternative place to be and a place that he is almost certainly, if convicted at trial, likely to go at some point anyway. And so, therefore, in this case, you know, there are other cases where defendants do not have necessarily a natural place to go, where they've spent a significant portion of their life outside the country. So it's the risk of flight in this particular case that makes electronic monitoring not a viable option. Yes, Your Honor. But, well, it's the risk of flight abroad. So you're telling me that if you have ties to the U.S. and you don't have any ties, say, to any other country, then you are more likely to, then it is more likely the case that electronic monitoring will be appropriate for that person? I would say more likely to be appropriate. We would not concede that as long as there's no ties abroad, it would necessarily be appropriate. I understand that. But more likely to be appropriate, yes. I suppose something about the financial means of a defendant would have something to do with this question. Can you go out to Teterboro Airport and rent an airplane and get out to have a stand-in line at JFK? Yes, the means to free is absolutely another consideration. Of course, you know, citizens of other nations can also seek to get a passport, even if their passport is taken by pre-trial services or by the government, can seek to get a new passport from their embassy. So that's another reason why nationals of other countries, including Mr. Daniu, could present other concerns for an ability to flee. All right. Thank you very much. Thank you for your answers to those questions. Thank you, Mr. White. Appreciate it. It was a decision that-